All right, our fifth case for today is Matthew King, individually and as representative of the estate of Bradley King, against Hendricks County Commissioners. Mr. Cannon. May it please the court, opposing counsel. Good morning, your honors, or good afternoon, I guess it is now, your honors. My name is Dan Cannon and I represent Matt and Gina King, who are present here in the courtroom, on behalf of the estate of their son, Bradley King. And this for us, obviously, is first and foremost a case about grieving parents who lost a son, but secondarily, as we set forth in our brief, it's a case about the summary judgment standard. And I think it's useful, if you'll indulge me, to break down a little bit about where we are in the summary judgment universe, so I can illustrate, hopefully and respectfully, just how wrong the district court opinion is here. It's undisputed that, in response to a mental health distress call by Bradley King, Deputy Hayes showed up and, within two minutes of showing up at Bradley's house, killed him. Bradley was dead. It's also undisputed that, if that killing was unjustified, it was clearly unconstitutional. The defendants, of course, say that it was justified. And why? Because Bradley was wrong. And therefore, you can't say it's undisputed that it was unconstitutional. It is disputed by the defendants. You may disagree with it, but it is disputed. Certainly, yeah, but the way in which that they say that it's constitutional, the way in which that they say that it's a justified killing. Obviously, an unjustified killing would be unconstitutional. That's my point. They're saying it was justified because Bradley was armed and because he posed an immediate threat to officers. Can I ask you to back up, maybe, or turn sideways? Your claim, insofar as it's Hendricks County, appears to be a claim that there is insufficient training for dealing with people suffering from mental illness, that you don't go to a mental illness welfare check, which the record shows they knew they were doing, that the county should have provided specific training, and maybe you don't go with your service revolver out and ready to fire if it's a mentally ill person. Maybe you have a taser, maybe you have a baton, maybe you, you know, there are protocols that people could be trained for mental health stops. I wouldn't be the person to give the training, but to the extent that you're making a failure to train argument, what did you use to support, you know, that happened for Hendricks County Reserve officers or even Hendricks County regular officers? I think the better Monell claim, and I want to get around to answering your question, I think the better Monell claim for us is failure to promulgate a proper policy because what the unequivocal testimony was here is that even though Sheriff Clark knows that his deputies are going to be first responders to mental health crises, to suicide calls, so on and so forth, even though he knows that he's got situations in which only volunteer reserve deputies are going to be responding to those kinds of calls, and I'm concerned because the time is ticking, and I think whether you're framing it this way, the policy, or in response to Judge Wood's question about failure to train, one problem that I have with your case, and it relates to your ADA claim as well as your Monell claim, is you haven't really said what you want. You wanted merit deputies, you wanted a policy, you wanted more training, but you haven't really said how that would have changed it. What should these officers have done that would have diffused the situation? It's not like the cases where somebody kicks in the door when there's a schizophrenic individual threatening self-harm inside and that exacerbates the situation. What, when the officers show up and he's charging with a knife, should they have done that would have challenged the judges that, you know, we've spent most of our energy challenging the premise of that because we don't believe that he was charging with a knife. But assume you lose on that, you still have this other claim that Judge Wood is asking about. Our claim is that it should be something. They should have some sort of protocol that if they're going to respond. But that's not good enough. I mean, if there were, if some, you know, association of American counties or some such thing said, you know, here is the model protocol for mental illness calls and you shouldn't use the same weapons or the same devices on mental illness calls as you use on, you know, drug fight broke out, you know, calls or whatever other kinds of calls. We'd have a point of reference. Sometimes we see this in, you know, jail cases and you might say, don't have your service revolver out. That's going to terrify somebody who's already mentally unstable. Or don't do this or don't do that. But there needs to be some point of reference because you can't just sort of say to Hendricks County or anybody else, go forth and don't make the same mistake again without telling them what they need to do. I know you're trying to challenge the charging and all of that and I recognize. But for that, I'll just tell you frankly, my concern is, and I know it's a problem in these cases where the victim is dead. But I had trouble finding affirmative evidence that he didn't do that. Okay. Well, let me circle back to your first question and say that we have, there is a, and I don't have perfect recall about this, but there is a citation in our brief to an article that lays out mental health standards. I think that police ought to be following when they show up. And that they're violating the Constitution if they don't follow the standards in this article. That's a big thing to say. That would depend on the circumstance. It's certainly under circumstances where they know that they're going to have unqualified volunteer reserve deputies that are first responders to mental health crises. And they know that there's a prevalence of mental health and that's the testimony that we have. Yeah, they know there's a lot. You got that in the record for sure. We have that testimony from Sheriff Clark. Right. So they ought to be following some sort of different protocol and under that set of circumstances where they know what they know in Hendricks County. To go back to your second point, I mean, I think that there are, we've presented evidence in support of two major inferences. That if those inferences are drawn in their favor, as they should be on summary judgment, negate their defense that the killing was justified, which is where I was going at the beginning of my argument. The first is that Bradley was unarmed and the second one is that he was non-threatening. I see I'm getting close to the time that I'd like to use here for rebuttal. I'll remind you. But just to finish that thought, particularly on the second point, the idea that Bradley was non-threatening. We have not only the inconsistencies in the deputy's testimony, which is what most of the prior case law is about where summary judgment was upheld like Tom versus Voida. But we've also got physical evidence in the form of that autopsy report that even though Officer Hayes says he shot Bradley straight on as he was coming directly at him, that what the autopsy report says is that the bullet enters the left side of his body and transverses his entire... Yes, so he's got his body turned, apparently. Well, not according to Officer Hayes. Well, according to the bullet trajectory. Right. Officer Hayes says that he shoots him straight on in the center mass. What you have here is, and what the autopsy report says, is that the bullet enters the left side, goes from top to bottom, all the way across his body, and only slightly front to back. And if things happen the way that Officer Hayes said that they happened, and he shot him straight on center mass, the bullet's not going to go just slightly front to back. So we have not only the inconsistencies in the officer's statements, but physical evidence along with the character evidence that we've presented here. And if this court says that that's not enough for us to get past summary judgment on a case with a deceased plaintiff, then I think that this would be the only case in any circuit that I'm aware of to make that kind of ruling. Well, Counsel, your character evidence is inadmissible under 404. So you have the autopsy report, and you have the lack of fingerprints on the knife. Correct. And that goes to the inference that he was unarmed. Right. But it's not a whole lot to permit a reasonable jury to conclude that he wasn't charging at them with a knife. I think if you pick apart each individual tree, Your Honor, I think that anything can be. If you look at it and say, all right, well, the lack of fingerprint evidence doesn't by itself get you past summary judgment. Or the inconsistent statements don't by themselves get you past summary judgment. But looking at the forest, where you have all these different confluence of factors, you've got physical evidence, you've got the fingerprint evidence, you've got the autopsy report, you've got the inconsistent statements by the officers. That is more evidence than has ever been considered by any court, to my knowledge, in which summary judgment would be properly granted to a defendant. Okay. If you want to save a little, now's the time. Yes, Ms. Pollack. May it please the Court. My name is Karen Pollack. I represent the Appellees in connection with this matter. To the extent that the Court expressed an interest in the policy claim, I would address its attention to Palmquist v. Selvig, which it decided in 1997 on an issue similar to the one being espoused by the estate here. In that case, the Court said that in determining the adequacy of training, the focus must be on the program, not whether the particular officers were adequately trained. The estate's argument boils down to no special training equals deficient training. We cannot accept this equation. To do so would ignore the training the officers did receive. So you think one shouldn't even consider the question whether to have a constitutionally adequate program. Counties should include a unit about mental illness calls at the programmatic level. You know, I'm not, I don't have any problem with that. But the thought that you should treat a mentally ill person the same way you should treat somebody who's in the middle of robbing a bank is a little startling. I think, Your Honor, and it's not that he was a mentally ill person being treated the same as someone who was robbing a bank. Well, but he was. They, you know, they went with service revolvers drawn, blasting in. Your Honor, I respectfully disagree. They did not draw their weapons until they saw the knife. Counsel, isn't there some... And he did not drop it when they told him to. Counsel, isn't there some mental health training in the county's policy? There is. They have mental health training at the academy, ongoing training interdepartmentally. And what's it about? I mean, what's the scope of this training? And do the volunteers receive it? The volunteers do receive it. Yes. The reserves receive the same training as the deputies. That has been established. So is it about use of deadly force, alternative weapons, ways to take people down? There's crisis intervention training, Your Honor. But again, when someone has a knife, a knife, a five-inch knife is no less sharp when it is wielded by someone who is mentally ill. A knife is a knife is a knife. And when someone is coming at you with a knife, I don't think a psychological assessment is appropriate. And so whether someone's... No, I wasn't saying that, but maybe a taser or a baton or something else is appropriate. Well, then, Your Honor, then you're... Unless your presumption is let's just kill everybody, you know, let's use deadly force as our weapon of first resort. But I think then you're getting inconsistent with the standard of the Fourth Amendment, which is you have the right to use deadly force when you are being confronted with deadly force and your health or someone... or your life or someone else's is in danger. So when someone lunges at you with a knife, irrespective of their mental status... Counsel, I understand this to be two separate questions. Could the officers defend themselves if attacked with a knife is a constitutional question. Is there something the county needs to do is effectively a statutory question about what has to happen for the training of public employees to accommodate other people with mental illness. And answering the constitutional question or giving immunity doesn't necessarily answer the statutory question. I wish you'd address them separately.  Your Honor, I think the court has addressed this issue. And again, in Palmquist, it cited the city of Canton v. Harris and Irwin v. County of Manitowic. Don't just reel off names. I wish you'd address my question. I want you to distinguish the Constitution and the immunity problem that applies to the personal individual defendants from the statutory question that applies to the county. Well, they're not... Meaning the ADA and... Oh, you want the ADA claim you're talking about? That's a statute. It's a statute. It's being relied on by the plaintiffs. And you can't invoke immunity doctrines or constitutional rules in responding to a statutory claim. That's what I'm trying to get you to do now. Well, the ADA claim, Your Honor, as you know, this circuit has not said it applies in the context of arrests. But is this an arrest or a wellness check? I'm sorry? Is this an arrest or a wellness check? Well, it ended up being a seizure, obviously. Of course, but they know. They comment to one another on the way over there something along the lines of this is a mental. It's shorthand. But they know they're there not because somebody is robbing the house or burning the fields or anything. They know they're there to check on the well-being of a person who can't fend for himself. Correct. They don't know the nature of his disability at that point. Of course, but they know that he's a person presumptively with a disability, some kind of disability. And he's called 911 for assistance, which is what makes you think whatever line of cases there is about arrests in the ADA may not be the right line of cases to be looking at. Well, I think, Your Honor, I think the split between the circuits and the fact that County of San Francisco versus Sheehan, the Supreme Court, declined to discuss that issue. Sheehan was resolved on the basis of qualified immunity for the officers. Correct. And that may be completely dispositive about the claim against the officers here, but it does not resolve the claim against the county under the statutes. Correct. And it was also arrest, and Chief Judge Woods positing a distinction between the wellness check and the arrest. Well, Your Honor, but I think the ADA is not violated unless the injury was a result, was the discrimination or the injury was because of the disability. And that certainly was not the case here. Well. What happened did not happen because of Mr. King's disability. It happened because he was coming to Deputy Mays with a knife. It depends where you start the story. If, in fact, and I have to say I was disturbed by the district court's adoption of the notion that somehow all people with this disability have a fetish for knives, I know of no social science research that would support such a broad statement. Maybe he did, or maybe, I don't know. I believe he was relying on Mr. King, the father's testimony. He can rely on whatever he wants to, but if you're going to make a statement all people do X, I would like some support for that because I can think of all sorts of assumptions about all people in certain categories that have proven to be wrong over the years. And so the question is if the problem is how do you deal with citizens who have mental health problems and do you need to give them the benefits of police protection or social welfare worker protection? It doesn't even have to be police. It could be state protection of some kind. That's not the same issue as ADA and arrests. ADA and arrests makes me think of the police officers sitting on somebody's chest and suffocating them or something like that. Well, I think Judge Springman addressed this in the Hamilton case, which we cited in our underlying brief in Motion for Summary Judgment. Very similar facts were a child with a disability, but yet a large child. He might have had the mental abilities of a five-year-old, but he was a 15-year-old who was very actively fighting with his family members when we were called, police were called. And when it ended up being that there was a struggle and he was injured, his parents sued. And Judge Springman found that the actions taken by the police officer had nothing to do with his disability, were not caused by his disability. Well, we need to think through these things for ourselves. We have great respect for other colleagues around, especially in the district court. But what we're looking at, no qualified person with a disability. Qualified means basically being a citizen here, should be excluded or denied the benefits of the activities of a public entity, including perhaps public protection. He's reached out for help. Tragically, help turns out not to be there. Well, Your Honor, help is there, and help has been there in the past for him. No, it's not. Help turned out to be lethal, but that doesn't seem help to me. He had the same help in the past, and it didn't turn out to be lethal because he didn't attack them with his knife. He gave it up. On this occasion, he didn't give it up. They didn't work with him the way the other officers did. There was no opportunity, Your Honor. Well. There was no opportunity. He pulled the knife out of his pockets, was told to drop it, and then he lunged it on Deputy Hayes. There was no opportunity for reflection or contemplation. I'm not sure that answers Judge Easterbrook's question yet. I mean, it still takes us back to the officers. It takes us back to the claim against the officers, and we need to distinguish the claim against the officers from the statutory claim against the county. I'm sorry. I thought I did address it, Your Honor. The statutory claim against the county, I think we prevail because we did not – what happened to Mr. King did not happen because of his disability. Well. And that's what the standard is. Right. You have to be discriminated against them because of their disability. Go ahead. Maybe you think there's a failure of proof. We were exploring that in discussing this with Mr. Cannon. But what the legal standards are about that is if we think there has not been a failure of proof, something we need to address. Well, I certainly think there's been a complete failure of proof. I think the estate is confusing a conflicting account with a theory. And so what they have is certainly they have several theories, but they have no evidence to support it. If, as they argue, Deputy Hayes, after shooting Bradley King, actually when it's – As I understand your brief, you're really pitching everything on the contention that the plaintiffs did not have an adequate causal claim. But you certainly have not tried to inform us what the legal standards are, if you're wrong about that. A causal claim? I'm not going to try to explain that. Okay. I apologize, Your Honor. I'm not sure I follow what you're asking me. But obviously the theories that they are – they are saying this shooting took place for no reason, that Bradley King did not really have a knife, and so – You're still confusing the claim against the officers with the claim against the county. I apologize, Your Honor. I'm not sure what you want me to say. I mean, I think you've given us what we need. So thank you very much. I will give you a full minute if you need it. You have 30 seconds, I think, Mr. Cannon. Thank you. The help that showed up for Bradley in the past that opposing counsel refers to gets to the heart of the matter on the issue of failure to promulgate proper policies and failure to train. When deputies showed up previously, they recognized the need that – the need that Bradley had to get specialized services, and they called an ambulance, and they were able to talk him down in the other situation. How are they supposed to do that if he's mid-charge? We dispute that he's mid-charge. I know, but suppose you're – suppose we don't think you have enough for that. I mean, if you want to put all your eggs in that basket, that's your choice. So if you don't have an answer, I'll take that. What about what Judge Easterbrook was talking about? From the point of view of the Americans with Disabilities Act, what should the county be doing? They should be training their volunteer reserve deputies to be able to spot mental health issues and respond accordingly. And we know they can do that. That's about the vaguest thing you could possibly say. You might as well say they should be giving him adequate training. But you would expect in litigation that you would produce some training protocol produced. This was Chief Judge Wood's question. You'd produce some training protocol produced by some expert group and then make an argument that perhaps a federal agency with authority over the Americans with Disabilities Act has said you need to use that kind of thing. And then you'd make the causal argument that the lack of that led to this death. I don't see any of those arguments in your brief. I think the causal argument is made by the simple fact that we know that there are protocols that this county can use to show up on the scene. Yeah, but we don't know that they would have made any difference in this case. We do. No. How do we know that they would have made a difference when we don't even know what they are? You haven't told us concretely what they had to do. At least sending an ambulance. At least being able to talk somebody down. We're trying to talk somebody down rather than just showing up on the scene and shooting. Counsel, can I ask you a question? Now you're talking about the police again and not about what the county had to do. The police are the first responders. Counsel, let me just ask you one quick question before you sit down. Are you claiming that the county, for purposes of the ADA claim, acted with deliberate indifference because you're seeking damages and injunctive relief. You can't get injunctive relief at this point. That's moot. We don't need a deliberate indifference for the ADA claim, Your Honor, for the Monell claim we do. On the ADA claim, all we have to show is that they did not reasonably accommodate people with mental illnesses. And there's nothing in the law that I'm aware of that requires us to set forth what their program to accommodate those people ought to be. It's just, we know for sure. You have to show that there is something they are required to do that they haven't done. We know that the county has, in past years, sent out help. Indeed, it sent help this time when requested. We know that in past years the help has been, well, reasonably successful, at least not deadly. We know that something went wrong this time. It would surely help if there's a contention that the county is systematically off track to know what it was that distinguished those or what kind of program would have prevented the distinction between the earlier incidents and this one. It's not as if the county is saying, I'm sorry, Brad is mentally disturbed. We're not responding to his calls. That does seem to me to be part of the plaintiff's burden. I understand that. And candidly, to the extent that we are deficient in some area on this, I think it is in articulating specifically what that criteria ought to be. Well, you just mentioned, just for example, something. Maybe with mental health crises, you know, you don't send officers. You send an ambulance, you know, and so he sees an ambulance visually, and that means help to him and doesn't mean confrontation. That's very simple. Right. Is there some expert group that's concluded that that's what a municipality needs to do when a mentally disturbed person calls 911? Send an ambulance. Don't send a cop. Is there? Is that a standard? Other than the journal articles that we've presented here, Your Honor, we haven't gotten much into the specifics on that. But I will point the court to the deposition testimony of both Jason Hayes and Brett Clark in this case. And we asked him specifically, do you know how the decision is made to send out an ambulance on a call? Because we know you can do it. And everybody acknowledges, yeah, we can do it. Of course they can do that. And we asked him, what's the criteria for doing that? He doesn't know. And according to Sheriff Clark is, well, you just use common sense. Our point is that's not good enough. Okay. Thank you, Your Honor. I think we'll take it with that. Thank you very much. Thanks to both counsel. We'll take the case under advisement.